WALTER B. COX and VIRGINIA COX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cox v. Commissioner
Docket No. 6448-75.
United States Tax Court
T.C. Memo 1985-324; 1985 Tax Ct. Memo LEXIS 307; 50 T.C.M. (CCH) 317; T.C.M. (RIA) 85324; July 2, 1985. Theodore Fitzgerald *308 and Ernest J. Szarwark, for the petitioners. Allen E. Lang, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Addition to Tax [1]
Year
Deficiency
Section 6653(b) [2]
1967
$ 24.567.75
$12,283.88
1968
32,284.03
16,142.02
1969
55,854.16
29,927.08
Total
$112,705.94
$56,352.98
The issues for decision are: (1) Whether petitioners had unreported taxable income for each of the years in issue; (2) whether petitioners are liable for the fraud addition to tax pursuant to section 6653(b) for each of the years in issue; (3) whether the statute of limitation bars assessment and collection of the deficiencies determined for each of the years in issue; (4) whether petitioners are entitled to depreciation deductions for the taxable years 1967, 1968, and 1969 in *309 the respective amounts of $608.33, $2,000.00, and $2,200.00; and (5) whether petitioners are entitled to an investment tax credit for the taxable year 1967 in the amount of $696.64. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Walter B. Cox (hereinafter petitioner) and Virginia Cox, husband and wife, resided in Chesterton, Indiana, when they filed their petition in this case. Petitioners timely filed joint Federal income tax returns for 1967, 1968, and 1969 with the Internal Revenue Service. Subsequent to the filing of the petition herein, petitioners were divorced. From November 1923 until April 1958, petitioner's father, Belnap Cox, was employed by the Norfolk and Western Railway Company. From September 1958 to December 1961, Belnap was employed by the H.L. Leet Lumber Company. In addition to his employment with the railroad and lumber companies, Belnap owned and farmed a 44-acre farm in Lucasville, Ohio, and he sharecropped a 100-acre farm near Lucasville. On these properties, Belnap raised milk cows, horses, and hogs, and he sold both milk and hogs. Prior to his death on March 7, 1966, Belnap stored a sizeable amount of money *310 in the family's home near Lucasville, Ohio. Following Belnap's death, petitioner, his brother, and petitioner's mother, Bessie, took the money which Belnap had stored in his home and placed it in a newly opened safe deposit box in the Security Central National Bank of Portsmouth, Ohio. The money that petitioner and his relatives placed in the Security Central National Bank consisted of a large collection of loose coins of different denominations, packages of coins marked "uncirculated," and bundles of paper money, including $1 silver certificates, as well as old $2, $5, $50, and $100, and a few $500 bills. During April 1966, petitioner and Sylven Bodin (hereinafter Bodin) flew to Portsmouth and transported the coins and bills from the Security Central National Bank of Portsmouth, back to Chesterton, Indiana, area. Once in his possession, petitioner sorted through the bills and coins. Many of the bills were very old and petitioner traded these bills for new money at the Chesterton State Bank. In addition, petitioner sold many of the $1 silver certificates through a friend to collectors for amounts in excess of face value. During the years 1967, 1968, and 1969, petitioner was *311 employed as a master mechanic by Walsh Construction Company, Inc. (hereinafter Walsh). Walsh was a prime contractor involved in the construction of Bethlehem Steel Corporation's plant at Burn's Harbor, Indiana. As a master mechanic petitioner was responsible for supervising the maintenance and repair of heavy equipment at Bethlehem's Burn's Harbor plant. During the construction of Bethlehem's plant, a kickback operation developed between personnel of Bethlehem, Walsh, and others, through false documentation. Bethlehem was overcharged for work actually performed and charged for work not performed and materials not delivered. Participants in the kickback scheme received distributions of gifts, services, or cash. Commencing sometime in 1966 and continuing throughout the years in issue, petitioner materially participated in the kickback scheme by acting as a go-between, delivering kickbacks as ordered by his superiors. [3] During this period petitioner received approximately $275,000 in currency from Tom Walsh, Jr., for the purpose of making payoffs to Bethlehem officials and others. Upon receipt of the cash, petitioner placed some of it in a safe deposit box at the Chesterton *312 State Bank, deposited some of it in his checking account, and carried some of it on his person, as much as $20,000 at a time. Generally, petitioner made direct cash payments or paid for work performed on the personal residences of Walsh or Bethlehem employees. Petitioner also frequently provided participants with furnishings and appliances which were purchased from Nasson's Appliances. Between May 1967 and November 1969, petitioner purchased, for a total of $9,568.25, 8 televisions, 3 sofas, bedroom and dining room furniture, carpeting, a washer and dryer, and other miscellaneous household furnishings, plus petitioner paid for the cost of installing and servicing the purchased items. Some of these items were delivered to petitioner, including the 3 sofas and 4 of the televisions. In addition, throughout *313 the years in issue, petitioner purchased various trucks and automobiles, several of which were acquired for individuals participating in the kickback scheme. During 1967, petitioner purchased five automobiles and one pick-up truck at a total cost $18,673.54. The pick-up truck was titled in petitioner's name. [4] One of the five automobiles was sold by petitioner to Roy Peterson for $3,393.52 in cash during 1967. Title to the remaining vehicles and their disposition could not be determined from the record. During 1968, petitioner purchased three automobiles at a total cost of $10,756.28. One vehicle was titled in petitioner's name, a second was sold by petitioner to Jessie Martin for $3,998.82 in cash during 1968, and title to the third could not be determined from the record. During 1969, petitioner purchased five automobiles, one truck and one pick-up truck at a total cost of $22,824.37. Three of the automobiles were titled in the names of third parties and two were titled in petitioner's name. The truck and pick-up were both titled in petitioner's name. On December 24, 1969, petitioner obtained a $70,000 cashier's check payable *314 to James Freedman [5] which Freedman negotiated on January 9, 1970. This check was in repayment of funds which petitioner had received from Freedman. Throughout the years in issue, petitioner opened numerous bank accounts and investment accounts in his name. The following chart shows the balances in the bank and investment accounts maintained by petitioner: Account
Jan. 1
Dec. 31
Dec. 31
Dec. 31
No.
1967
1967
1968
1969
Chesterton
State Bank
No. 02-0204-5
$8,638.36
$11,852.36
$17,101.12
$11,109.43
No. 13434
343.80
1st Merchants
National Bank
No. 724-448-7
2,954.27
Investors
Diversified Fund
No. 024-1234664
41,862.81
58,443.78
59,358.74
No. 013-1234-664
6,083.88
11,455.12
14,483.10
15,424.80
Dreyfus Fund
No. 508779-61
10,076.79
11,183.24
Imperial American
No. 112540
5,891.00
Royal Resources
No. 20090
12,359.00
Francis DuPont & Co.
No. 535-1803-14
1,986.38
*315 During June 1968, petitioner and his mother opened a joint investment account with Investors Stock Fund, Inc., with an initial investment of $15,000. The income proceeds from this account totaling $600 and $1,200, respectively, during 1968 and 1969, were to be paid monthly to petitioner's mother. The balances of this account on December 31, 1968 and December 31, 1969, were $15,250.62 and $14,741.20, respectively. During 1968 and 1969, petitioner acquired several pieces of real estate. In 1968, petitioner acquired 8.25 acres of land for $16,000, and subsequently paid $4,500 for a lot in Chesterton, Indiana. In 1969, petitioner paid $1,000 for a second lot in Chesterton, Indiana. Throughout the years in issue, petitioner purchased machinery and equipment which he repaired and sold for a profit. On each of the returns between 1966 and 1969, petitioner reported substantial income from his heavy equipment business, although he did not report beginning or ending inventories of heavy equipment on any of these returns and he presented no formal set of books and records. Petitioners reported gross receipts or gross sales from this heavy equipment business of $43,529, $36,485, and *316 $58,632.46, respectively for their 1967, 1968, and 1969 taxable years. Petitioner also owned several airplanes throughout the years in issue. During October 1967, petitioner purchased a 1967 Cessna Sky-Lane airplane for $17,248. This plane was disposed of in 1969. In 1968, petitioner purchased a 1969 Cessna Super Sky-Lane airplane for $29,965. Petitioner used these airplanes for personal pleasure, as well as to transport Walsh and Bethlehem employees and to perform other errands in furtherance of the kickback scheme. Walsh reimbursed petitioner for the expenses he incurred in transporting employees or running errands either directly by paying petitioner's operating expenses, or indirectly by manipulating petitioner's pay records to pay him for more hours than he actually worked or ran errands. Subsequent to the years in issue, an investigation into the kickback operation uncovered evidence of the participation of Freedman and Dunes Trucking Service. During April 1972, Freedman was killed in a plane accident. Shortly thereafter petitioner went to Dune's headquarters where he obtained 37 file boxes of books and records (hereinafter "the records") which he buried in the ground. *317 On June 12, 1972, petitioner was fired by Walsh because of his participation in the kickback scheme. Subsequently, petitioner met with members of the United States Attorneys Office in South Bend, Indiana, and he agreed to produce the records, cooperate with the investigation and testify as to the details of the kickback operation. The records were delivered to the United States Attorneys Office in South Bend, Indiana, during March 1974. A Federal Grand Jury sitting in South Bend, Indiana, subpoenaed the records and used them in related criminal proceedings against participants in the kickback operation. Petitioner fully cooperated with the Government and he acted as a Government witness in the prosecution of 28 cases involving participants in the kickback scheme. Petitioner was granted partial immunity from prosecution in exchange for his testimony in the criminal proceedings. On March 13, 1974, the United States filed a three-count criminal information charging petitioner with violating section 7206(1) by willfully subscribing to tax returns for 1967, 1968, and 1969, which he did not believe to be true and correct as to every material matter, in that he knew and believed *318 that he had received substantial adjusted gross income in addition to that shown on the respective returns. Under a plea bargain agreement petitioner waived indictment and pled guilty to count three of the criminal information charging him with a violation of section 7206(1) with respect to his 1969 taxable year. The charges against petitioner for his 1967 and 1968 taxable years were dropped. In 1976, upon the conclusion of the criminal proceedings in South Bend, Indiana, in which petitioner acted as a Government witness, the 37 boxes of records were transmitted to the Chicago, Illinois, Internal Revenue Service Regional Counsel's Office, for use in a Tax Court proceeding against Estate of James A. Freedman. During November 1977, these records were shipped by the Regional Counsel's office to the co-administrator of Freedman's estate who subsequently destroyed them. Petitioner had unsuccessfully sought to obtain these records in order to substantiate many of the claimed deductions on his returns for the years in issue. In the notice of deficiency, respondent reconstructed petitioners' taxable income using the net worth method and determined that petitioners' net worth increased *319 from $47,280.31 as of December 31, 1966 to $302,336.16 on December 31, 1969. After adjustments, respondent determined that petitioners had unreported taxable income of $47,883.79, $59,873.41, and $103,468.12, respectively for their 1967, 1968, and 1969 taxable years. In addition, respondent disallowed a $696.64 investment tax credit for petitioners' 1967 taxable year claimed with respect to the 1967 Cessna airplane, and respondent disallowed airplane depreciation deductions for their 1967, 1968, and 1969 taxable years in the amounts of $608.33, $2,000.00, and $2,200.00, respectively. Finally, respondent determined that all or part of the underpayment of tax required to be shown on the returns for 1967, 1968, and 1969 was due to fraud. OPINION The first issue for decision is whether petitioners underreported their taxable income for each of the years 1967, 1968, and 1969. However, before addressing this issue, a threshold question is whether assessment of the deficiencies for 1967, 1968, and 1969 is barred by the statute of limitations. Since the notice of deficiency was mailed more than three years after petitioners filed their returns assessment of any deficiencies is barred *320 by the general three-year statute of limitations under section 6501(a), unless respondent proves fraud. If respondent proves that petitioners filed false and fraudulent reurns with intent to evade tax, the deficiencies may be assessed at any time. Sec. 6501(c)(1). Alternatively, if respondent fails to prove fraud, he may assess the tax under the section 6501(e)(1) six-year statute of limitations if he proves that petitioners omitted in excess of 25 percent of the gross income required to be shown on their returns. In order to prove the applicability of the section 6501(c)(1) false return exception of the three-year statute of limitations, respondent must establish that petitioners' returns were false and fraudulent within the meaning of section 6653(b). Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976). To carry his burden of proof, respondent must establish by clear and convincing evidence for each of the years in issue that there was an underpayment of tax and that some part of each underpayment was due to fraud. Sec. 7454(a); Rule 142, Tax Court Rules *321 of Practice and Procedure; Hebrank v. Commissioner,81 T.C. 640, 642 (1983). With respect to petitioners' 1969 taxable year, respondent contends that petitioner's conviction under section 7206(1) collaterally estops him from denying fraud. Respondent determined the deficiencies herein by reconstructing petitioners' income under the net worth method. While the net worth method is an acceptable means of testing the accuracy of a taxpayer's tax return, its use requires the exercise of "great care and restraint" to prevent the taxpayer from being "ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute." Holland v. United States,348 U.S. 121, 129 (1954). As an essential condition for use of he net worth method, respondent must establish, with reasonable certainty, petitioners' opening net worth, and he must further establish either the existence of a likely source of unreported income or that he conducted a reasonable investigation of leads to negate the existence of nontaxable sources of income. Holland v. United States,supra;United States v. Massei,355 U.S. 595 (1958). *322 Moreover, respondent's net worth determination must be shown to be accurate at the beginning of the net worth period and at the end of each of the taxable years. Holland v. United States,supra.
Since respondent must prove fraud to lift the bar of he statute of limitations and respondent's success in proving fraud turns largely on his ability to establish that substantial amounts of income were omitted from petitioners' tax returns for the years in issue, we must first examine the accuracy of respondent's net worth computation. I. Unreported Income
A. Opening Net Worth
Respondent determined that petitioners' net worth as of January 1, 1967, was $47,280.31 which included no undeposited cash on hand. Petitioners maintain that as of January 1, 1967, they had a cash hoard of approximately $100,000 which they received from petitioner's father, and that a significant portion of their apparent increases in net worth are derived from that cash hoard. Thus, petitioners contend that respondent has not established petitioners' opening net worth with reasonable accuracy. Although the record does not reflect that petitioner received a total of $100,000 *323 in cash from his father's estate, it clearly indicates that petitioner in fact received some currency from the estate. [6] Petitioner presented credible evidence that he received both coins and currency from his father. Among other things, there is ample evidence that petitioner removed coins and currency from his father's home and placed it in a newly opened safe deposit box in the Security Central National Bank of Portsmouth, Ohio. Petitioner presented bank records which prove that the safe deposit box was opened within several days of his father's death, and he also presented evidence which corroborates that he brought cash and coins from the Security Central National Bank back to the Chesterton, Indiana, area during April 1966. Petitioner's proof that he recived cash from his father's estate just prior to the years in issue raises serious questions as to the accuracy of respondent's opening net worth computation. [7]
*324 B. Likely Source of Unreported Income; Negation of Nontaxable Sources of Income; Statute of Limitations; and Fraud
Petitioner has raised several other factors which strongly indicate that respondent's net worth computation is in error and that the deficiencies derived therefrom are arbitrary and unreasonable. Petitioner contends that respondent's net worth computation fails to include approximately $35,000 of machinery and equipment that petitioner purchased prior to 1967 and sold during the years in issue. Respondent asserts that petitioners failed to maintain adequate books and records containing beginning or ending inventories and that in the absence of competent or credible evidence respondent properly omitted the heavy equipment inventory from the net worth computation. [8] Petitioner's failure to maintain beginning and ending inventories, while negligent, does not negate the existence of a significant heavy equipment business. Petitioner has presented credible testimony to support his argument that he acquired various pieces of equipment prior to 1967 which he sold throughout the years in issue. Petitioner testified that, prior to 1967, he purchased: $14,000 worth *325 of miscellaneous parts which were sold during 1967; a $12,500 bulldozer which was sold during 1968; a $3,715 grader which was sold during 1968; a $4,233 V-8 caterpillar which was sold during 1969; and a $1,000 HD6 loader which was sold during 1969. The record firmly establishes that petitioner made substantial purchases and sales of heavy equipment and machinery throughout the years in issue and it is entirely reasonable to believe that he acquired equipment prior to 1967 which he sold throughout the years in issue. Petitioners maintain that they supplied information, including canceled checks, to Special Agent Kaffenberger that corroborated their equipment purchases and sales but that these records were improperly released by respondent to Freedman's estate and subsequently destroyed. Respondent could have easily investigated petitioner's claimed additional income from the heavy equipment business but there is no evidence in the record that he in fact did perform any investigation into petitioner's heavy equipment business. Petitioner *326 also challenges respondent's net worth analysis on the ground that it improperly includes items purchased from Nassons Appliances. Respondent treated all items purchased from Nassons Appliances which were delivered to petitioner as acquired by him for his personal use. [9] Respondent contends that the only items delivered to kickback participants were television sets or, on one occasion, a washer and dryer, and that he properly included in petitioners' net worth three sofas, bedroom and dining room furniture, carpeting, and four of the eight televisions that petitioner purchased. Three of the televisions included in petitioners' net worth were acquired by petitioner during 1967. Since respondent admits that television sets were a primary gift in the kickback operation, we find petitioner's statement that he delivered these sets to participants in the kickback scheme to be credible. Petitioner next asserts that respondent improperly included in petitioners' net worth automobiles titled in petitioner's name, some of which were acquired by *327 petitioner for distribution in connection with the kickback scheme. Respondent maintains that there is no evidence that any of the vehicles titled in petitioner's name were ever retitled to anyone else, or that any of these vehicles were redistributed to kickback participants. However, respondent has stipulated that two of the automobiles purchased by petitioner and titled in his name were subsequently sold to third parties. This contradicts respondent's argument that no vehicles titled in petitioner's name were ever retitled to anyone else, and suggests that other automobiles may have been transferred to third parties as petitioner maintains. [10]
Finally, petitioners allege that the single greatest error in respondent's net worth computation involves the inclusion in petitioners' 1969 net worth of a $70,000 cashier's check payable to James A. Freedman. Respondent maintains that he properly included the *328 $70,000 check as an asset on hand as of December 31, 1969, because there was no proof of delivery and therefore he was entitled to consider it delivered near the date on which it was negotiated. Respondent further argued that there was no credible evidence that petitioner owed Freedman money, and that if the check represented loan proceeds, it was a loan from petitioner to Freedman which is a nondeductible personal expenditure. Petitioner maintains that the $70,000 check represents the payment of funds owed by petitioner to Freedman and that it was delivered to Freedman prior to December 31, 1969. We are convinced that respondent's inclusion of this check in petitioners' 1969 net worth is not proper. First, respondent's assertions that because the check was not negotiated until January 9, 1970, it was more probably delivered to Freedman sometime close to that date is completely unsupported by the record. Respondent must establish the accuracy of his net worth computation and he may not rely on the absence of proof as to the actual date of delivery to prove that delivery occurred January 9, 1970, when the check was negotiated by Freeman. The fact that the check was drawn by petitioner *329 on December 24, 1969, but not negotiated until January 9, 1970, simply does not, in the absence of any other evidence, tend to prove that the check was delivered closer to one date or the other. Second, respondent has failed to negate the reasonable explanation of petitioner which was corroborated by third parties, that the $70,000 check represented the payment of money that petitioner owed Freedman. [11] Moreover, respondent's assertions that the $70,000 check represents a loan from petitioner to Freedman is unsupported by the record. Respondent has submitted no loan documents or testimony from individuals which would indicate that the $70,000 check represented a loan from petitioner to Freedman. The totality of the evidence indicates that respondent's net worth computation contains a sufficient number of errors and items whose inclusion is highly questionable that respondent cannot be deemed to have established a prima facie net worth case. He has not established petitioners' opening net worth with reasonable *330 certainty. Respondent's failure to prove the accuracy of its net worth computation renders the computation incapable of sustaining the deficiencies circumstantially derived therefrom. See Holland v. United States,supra.Moreover, respondent's claim that the likely source of the apparent increases in petitioners' 1967, 1968, and 1969 net worth were due to embezzlement from his employer and Dunes Trucking Service is not persuasive. Petitioner's employer monitored petitioner's distribution of cash and gifts and petitioner had to at least informally account for the funds he was responsible for distributing. It is inconceivable that petitioner could have embezzled over $210,000 during the years in issue, more than one-third of the total amount distributed pursuant to the kickback scheme, without his employer becoming aware of it. Under the circumstances, respondent has not shown by clear and convincing evidence that there is an underpayment of the income tax required to be shown on petitioners' 1967, 1968, and 1969 income tax returns. Accordingly, respondent has not proved that petitioner committed fraud within the meaning of section 6653(b) and respondent *331 may not invoke the section 6501(c)(1) false return exception to the three-year statute of limitations. Section 7454(a); Hebrank v. Commissioner,81 T.C. 640 (1983). Therefore, assessment and collection of the deficiencies is barred by the three-year statute of limitation unless respondent establishes the applicability of the six-year statute of limitations. Section 6501(e)(1) permits respondent to assess tax within six years if he proves that petitioners omitted in excess of 25 percent of the gross income required to be shown on their returns. Respondent's failure to prove petitioners' opening net worth with reasonable accuracy, and his erroneous inclusion of various assets in his reconstruction of petitioners' net worth, preclude a determination that petitioners omitted in excess of 25 percent of the income required to be shown on their returns for 1967, 1968, and 1969. Accordingly, respondent also has not proved the applicability of section 6501(e) six-year statute of limitations, and assessment of the deficiencies is barred by the general three-year statute of limitations.
*332 II. Collateral Estoppel
With respect to petitioners' 1969 taxable year, respondent asserts that petitioner is collaterally estopped from denying that he filed a fraudulent return and that he omitted substantial amounts of income from this return in reliance on the principles articulated in Considine v. Commissioner,68 T.C. 52 (1977) (Considine I) and Goodwin v. Commissioner,73 T.C. 215 (1979). Subsequent to these decisions, the Ninth Circuit decided Considine v. United States,683 F. 2d 1285 (9th Cir. 1982), in which it rejected as incorrect our analysis employed in Considine I and Goodwin.
In Wright v. Commissioner,84 T.C. 636 (1985), a Court reviewed opinion, we had occasion to carefully reexamine our opinions in Goodwin and Considine I and we concluded that they should no longer be followed. Our opinion in Wright controls disposition of the issue before us. In Wright v. Commissioner,supra, we held that a conviction under section 7206(l) does not collaterally *333 estop the taxpayer from denying fraud under section 6653(b). Under section 6653(b) respondent has the burden of proving by clear and convincing evidence that there is an underpayment of tax and that some part of the underpayment was due to fraud. See sec. 7454(a), Rule 142(b). This requires proof that the taxpayer had the specific intent to evade a tax believed to be owing. See e.g., Wright v. Commissioner,supra;Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Under section 7206(l) it is a crime for one willfully to make and submit any return verified by a written declaration that it is made under penalties of perjury which he or she does not believe to be true and correct as to every material matter. As we stated in Wright "the intent to evade taxes is not an element of the crime charged under section 7206(l)." 84 T.C. at 643. Thus we concluded that although a conviction under section 7206(l) is evidence of fraudulent intent, it does not establish as a matter of law that the taxpayer violated the legal duty with an intent or in an attempt to evade taxes. Accordingly, we hold that petitioner's conviction under section *334 7206(l) does not estop him from contesting fraud under section 6653(b). We previously held that respondent has failed to prove by clear and convincing evidence that there was an underpayment of tax with an intent to evade taxes during each of the years in issue. Consequently, respondent has not proven that petitioner committed fraud with respect to his 1969 taxable year and assessment of the deficiencies is barred by the statute of limitation. Depreciation Deductions, Investment Tax Credit
Because we have held that the statute of limitations bars assessment of the deficiencies for each of the years in issue it is unnecessary for us to decide whether petitioners are entitled to the claimed depreciation deductions and investment tax credit. To reflect the foregoing, Decision will be entered for the petitioners.
Footnotes
1. Respondent has not asserted the fraud addition to tax against Mrs. Virginia Cox, and her liability is limited to the determined deficiencies in tax. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. Petitioner's distribution of kickbacks was made at the direction of his superiors at Walsh. Petitioner did not have authority to determine who received the cars, television sets, or money. Often, petitioner substantiated the kickbacks made to Walsh or Bethlehem employees for his superiors by showing them canceled checks or by having someone witness the transfer of cash.↩
4. This vehicles was sold during 1969.↩
5. James Freedman, sole proprietor of Dunes Trucking Service, actively participated in the kickback scheme by causing Dunes Trucking Service to submit false invoices to Bethlehem. Throughout the years in issue, petitioner received from Freedman approximately one-third of the proceeds resulting from these false invoices. The money and other benefits that petitioner received from Freedman were distributed to employees of Bethlehem and Walsh pursuant to the kickback scheme.↩
6. In support of his position that petitioner had no cash hoard, respondent points to an affidavit executed by petitioner in May 1978. After consideration of the circumstances surrounding execution of the affidavit, and the evidence presented at trial, we find that the affidavit is not credible evidence. ↩
7. We have merely found that petitioner has proved that he received some cash from his father's estate which respondent did not include in petitioners' cash on hand as of January 1, 1967. Petitioner has not proved the exact amount of cash he received or that he in fact expended the cash throughout the years in issue.↩
8. In effect, respondent is treating petitioner's machinery and equipment inventory as having remained constant throughout the years in issue.↩
9. Respondent did not include in petitioners' net worth those items which Nassons Appliances delivered directly to kickback participants.↩
10. Since four of the six automobiles and trucks included in petitioners' net worth were acquired during 1969 a reasonable inference is that they were acquired to further the kickback scheme, especially since three of these vehicles were the same make and model automobiles.↩
11. At trial, respondent's special agent admitted on cross-examination that he had been told by several people that petitioner owed Freedman approximately $90,000.↩