ROGER L. TUTOLO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tutolo v. Commissioner
Docket No. 16888-92
United States Tax Court
T.C. Memo 1995-186; 1995 Tax Ct. Memo LEXIS 187; 69 T.C.M. (CCH) 2480; April 20, 1995, Filed *187 Decision will be entered under Rule 155. For petitioner: Joseph P. Alexander, David G. Lambert, and J. Timothy Bender. For respondent: Mario J. Fazio. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined income tax deficiencies and additions to tax for petitioner as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
1983
$ 4,636.94
$ 2,318.47
[1]
- 0 - 1984
14,977.31
7,488.66
[2]
$ 3,744.33
We must decide the following issues: 1. Whether petitioner received unreported income of $ 16,724 in 1983 and $ 53,456 in 1984. We hold that he received but did not report income of $ 16,724 in 1983 and $ 36,590 in 1984. 2. Whether petitioner is liable for the addition to tax for fraud for 1983 and 1984 under section 6653(b). We hold that he is. 3. Whether petitioner is liable for the addition to tax for substantial understatement for 1984 under section 6661. We hold that he is if the Rule 155 computation shows that there is a substantial understatement. 4. Whether *188 the assessment for 1984 is barred by the statute of limitations. We hold that it is not. Section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT A. Petitioner
Petitioner resided in Grafton, Ohio, when he filed the petition. Petitioner worked as a hairstylist from 1963 to 1981. In July 1981, he sold his haircutting and styling equipment. He reported on his 1981 income tax return that he realized $ 13,000 from the sale. Petitioner reported $ 6,767 of net profit from his hairstyling business in 1981. Petitioner became a full-time bookmaker soon after he ended his hairstyling business. In 1983, petitioner's son Michael was a high school student. Petitioner bought a 1977 Mercury for $ 400 on April 1, 1983, and titled it in petitioner's name. Petitioner bought a condominium in Mentor, Ohio, in 1983 for $ 44,500. Petitioner lived in Mentor, Ohio, in 1983 and most of 1984. Petitioner married Eleanor Guerrini (Guerrini) on November 23, 1984. Guerrini owned a home in Maple Heights, Ohio, in which she had lived since the late 1960's or early 1970's. *189 She received that home as part of the divorce settlement from her former husband. Guerrini made most of the 1984 mortgage payments on her Maple Heights home before she married petitioner. Guerrini made two mortgage payments to Horizon Savings & Loan Co. (Horizon) in December 1984 totaling $ 364 which reduced her principal by a total of $ 108.84. Guerrini received public assistance payments totaling $ 696 from January 1 to June 22, 1984, before she married petitioner. In the first 11 months of 1983, Guerrini made regular deposits totaling $ 11,245 in her checking accounts. Petitioner and Guerrini bought a home in Chesterland, Ohio, in October 1984 for $ 101,000. They bought the home with a $ 50,000 downpayment and a $ 52,100 mortgage. [1] Guerrini's mother gave petitioner and Guerrini $ 26,000 which they used as part of the downpayment on the Chesterland house. *190 Around February 23, 1984, Guerrini bought a 1974 Chevrolet for $ 500 and titled it in her name. Petitioner received a gift of $ 14,621 from his father in 1984. Petitioner deposited this gift in his checking account and used it to buy a Lincoln automobile in 1984. Petitioner and Guerrini were divorced after 1984. B. Petitioner's Bookmaking Activities
Sometime in the early 1980's, petitioner began accepting illegal bets on sporting events, and, to a lesser degree, began sponsoring illegal poker games. Petitioner operated his bookmaking activity from the basement of his home. He took bets by telephone. Petitioner made a profit in his bookmaking business by collecting a 5-percent premium from bettors, called "vigorish". For example, petitioner required bettors to wager $ 11 to win $ 10. Petitioner tried to make a 5-percent profit no matter who won the athletic contest which was the subject of the bets. To do so, petitioner changed the point spread to encourage bettors to bet an equal amount on both teams. Petitioner paid winning bettors in cash each week. Petitioner kept about $ 10,000 in cash to run his bookmaking business. Petitioner sometimes placed or "laid off" *191 bets with other bookies when he had too many bets for one team and he could not afford to lose the amount wagered. Petitioner had two checking accounts in 1983 and three checking accounts in 1984 at Society National Bank. One of the accounts was in the name of Roger T. Hairstyles. Petitioner deposited $ 9,151.39 in 1983 and $ 23,667.42 in 1984 in this account. Petitioner deposited in his checking accounts a total of $ 15,005.37 in 1983 and $ 63,506.08 in 1984. Petitioner's father gave $ 14,621.09 of the $ 63,506.08 amount as a gift to petitioner. Petitioner received unreported income of $ 16,724 in 1983 and $ 36,590 in 1984. [2]
C. Petitioner's Accountants and Tax Returns
Lawrence Koesel (Koesel), a certified public accountant *192 with Ducato & Kline, prepared petitioner's 1983 and 1984 tax returns. Petitioner met with Koesel before his 1983 income tax return was prepared. Petitioner told Koesel that he was a barber and a sales representative. However, petitioner was not a barber or sales representative in 1983 or 1984. Petitioner's primary source of income in 1983 and 1984 was illegal bookmaking and card games. Petitioner gave handwritten records to Koesel which purport to show his daily and weekly gross receipts from hairstyling for 1983 and 1984. The records show that he had gross receipts of $ 26,175 for 1983 and $ 14,490 for 1984. Petitioner's daily and weekly totals were incorrect. Petitioner's total checking account deposits for 1983 were $ 11,169.63 less than the gross receipts shown on petitioner's handwritten summaries for 1983. Petitioner's total checking account deposits for 1984 ($ 63,506.08 less $ 14,621.09) are $ 34,394.99 more than the gross receipts on petitioner's handwritten summaries for 1984. In 1984, petitioner gave $ 17,353 to Bill Whetzel, the owner of GTV Productions (GTV). GTV issued petitioner a $ 17,353 check and a bogus Form 1099 to conceal the source of his income from *193 Koesel and respondent. Petitioner incorrectly reported on his Schedule C for 1983 that his primary source of income was his hairstyling business. He incorrectly reported on separate Schedules C for 1984 that his occupation was hairstylist andsale representative. Petitioner reported $ 17,353 of gross receipts from his nonexistent sales representative business on his Schedule C. Petitioner claimed his son, Mlchaei, as a dependent for 1983. Petitioner and Guerrini claimed two personal exemptions for 1984. Petitioner did not sign a Form 872, Consent to Extend the Time to Assess Tax, for 1984. Respondent determined that Guerrini was an innocent spouse for 1984 under section 6013(e). Respondent asserted deficiencies in and additions to petitioner's tax for 1983 and 1984 in a notice of deficiency dated April 28, 1992. D. Criminal Prosecution
Respondent began a criminal investigation of petitioner in 1986. The U.S. attorney for the Northern District of Ohio filed an information against petitioner on August 11, 1989, that charged petitioner with filing a 1984 income tax return which: He did not believe to be true and correct as to every material matter in that the said *194 return reported total income in the amount of $ 23,073.00 whereas, as he then and there well knew and believed, he had received substantial additional income from gambling activities in addition to that heretofore stated. In violation of Title 26, United States Code, Section 7206(1).
On February 8, 1990, petitioner admitted the allegations and pleaded guilty to violating section 7206(1). He was sentenced to 1 year and 1 day in jail and fined $ 15,000. E. Respondent's Audit of Petitioner
Respondent's revenue agent did not ask petitioner or his accountant to reconcile his receipt sheets to his bank deposits. Petitioner first told Koesel that he had received a purported loan from Leonard Biggs (Biggs) after respondent's examination of petitioner's 1983 and 1984 returns began. OPINION A. Net Worth Method
Respondent used the net worth method to determine petitioner's income for the years in issue. Under the net worth method, income is computed by determining a taxpayer's net worth (excess of the cost of assets over liabilities) at the beginning and end of a year. The difference between the two amounts is the increase in net *195 worth. This difference is increased by adding nondeductible expenditures, including living expenses, and by subtracting gifts, inheritances, loans, and the like. Holland v. United States, 348 U.S. 121, 125 (1954); United States v. Giacalone, 574 F.2d 328, 330-331 (6th Cir. 1978). An increase in a taxpayer's net worth, plus his nondeductible expenditures, less nontaxable receipts, may be considered taxable income. Holland v. United States, supra.
In a net worth case, respondent must: (1) Establish with reasonable certainty an opening net worth and (2) either (a) show a likely income source or (b) negate possible nontaxable sources. Id. at 132-138; Smith v. Commissioner, 91 T.C. 1049, 1059 (1988), affd. 926 F.2d 1470 (6th Cir. 1991); Brooks v. Commissioner, 82 T.C. 413, 431-432 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Petitioner earned most of his unreported income in 1983 and 1984 from illegal gambling activities. *196 Petitioner argues that respondent's net worth calculation is invalid because it has many errors. We agree that respondent made some errors. We make adjustments to correct those errors, but we disagree that the net worth calculation is invalid. We resolve the differences between petitioner's and respondent's net worth calculations next. 1. Petitioner's Assets
a. Cash on Hand
Respondent used zero cash on hand for petitioner at the beginning and end of 1983 and 1984. [3] Petitioner contends that he had cash on hand of $ 40,000 on January 1, 1983, and $ 20,000 on December 31, 1983. We believe petitioner had some cash on hand for his bookmaking business, but we disagree with both: (a) The amount of cash petitioner claims that he had on hand, and (b) his statement that he had less cash on hand at the end of 1983 and 1984 than at the beginning of each year. *197 i. Amount of Cash on Hand
Petitioner had no records and called no other witnesses.[4] The only evidence of the amount of his cash on hand is his testimony. We may not arbitrarily disregard competent, credible testimony. Banks v. Commissioner, 322 F.2d 530, 537 (8th Cir. 1963), affg. in part and remanding in part T.C. Memo. 1961-237; Loesch & Green Constr. Co. v. Commissioner, 211 F.2d 210, 212 (6th Cir. 1954), revg. and remanding a Memorandum Opinion of this Court dated Dec. 11, 1952. Petitioner's testimony about the amount of his cash on hand was vague. On direct examination petitioner was asked how much cash he had on hand at the beginning of 1983. Petitioner answered, "Probably around $ 40,000." When petitioner was asked how much cash he had on hand as of December 31, 1984, he answered, "$ 10,000 something, $ 10,000, $ 20,000 maybe." He said he could not be more specific. *198 We do not believe that petitioner had $ 40,000 at the beginning of 1983. Petitioner testified that he got those funds from the sale of his hairstyling salon and from savings. He received $ 13,000 from the sale of assets of this hairstyling business in 1981; however, he testified that he used those funds to buy a condominium in 1983. We are not convinced that petitioner had $ 26,500 in savings. The only evidence that he had those savings is his general testimony; he did not explain how he obtained them. Petitioner contradicted himself when testifying about how much money he needed to operate his bookmaking business. He testified that he needed $ 40,000 when he claimed that he had that amount of cash on hand on January 1, 1983. However, he also testified that he usually needed $ 10,000 or $ 15,000 to operate his bookmaking business. We give less weight to petitioner's testimony because of his prior efforts to mislead his tax return preparer and the Government. Petitioner conducted illegal gambling activities. He willfully filed a false income tax return for 1984, in which he knowingly did not report substantial income from his gambling. Petitioner gave records showing fabricated *199 amounts of income to Koesel to prepare petitioner's tax return. Petitioner concealed his true source of income from Koesel and falsely reported on his Schedule C for 1984 that he was a hairstylist. He deposited his gambling income in the Roger T. Hairstyles account to mislead the Federal Bureau of Investigation, other law enforcement authorities, and respondent about his illegal activities. He funneled cash through GTV to hide the source of funds. He underreported his income. For these reasons, we do not believe petitioner had $ 40,000 in cash on hand on January 1, 1983. [5]
*200 ii. Whether the Amount of Petitioner's Cash on Hand Decreased in 1983 and 1984
We may adjust net worth due to changes in the amount of cash on hand. Cox v. Commissioner, T.C. Memo. 1985-324; Rose v. Commissioner, T.C. Memo. 1955-246; Bowman v. Commissioner, T.C. Memo. 1955-14. Even though we believe petitioner had cash on hand and respondent determined that he did not, this does not affect the correction of respondent's determination of the amount of his understatement of taxable income unless the amount of cash on hand dropped during the years in issue; i.e., if petitioner used that cash to buy additional assets, decrease liabilities, or pay for personal living costs during the years in issue. Singleton v. Commissioner, T.C. Memo. 1977-98, affd. per curiam 606 F.2d 50 (3d Cir. 1979). Petitioner did not prove his claim that he had less cash on hand for his business on December 31, 1983, than he had on January 1, 1983, or that he had less cash on hand on December 31, 1984, than he did on January 1, 1984. Petitioner's only *201 evidence was his uncorroborated testimony. Petitioner estimated that his adjusted gross income grew from $ 16,197 in 1983 to $ 28,568 in 1984 using his net worth calculation. This suggests that petitioner's business grew from 1983 to 1984. It would appear that the cash on hand that he needed for his business would also grow or at least remain the same. We conclude that petitioner's cash on hand was the same on January 1 and December 31, 1983, and January 1 and December 31, 1984. Petitioner testified that he needed at least $ 10,000 for his bookmaking business in 1983 and 1984. We conclude that petitioner had $ 10,000 cash on hand at the beginning and end of both 1983 and 1984. Thus, petitioner's cash on hand does not account for any changes in his net worth in 1983 or 1984. b. Petitioner's Bank Accounts
Respondent included a net increase in the balances of three of petitioner's checking accounts in his 1984 net worth. Respondent determined those amounts by subtracting the closing balances from opening balances shown on petitioner's bank statements for 1984. Petitioner contends that this method is unreliable because respondent did not first reconcile each bank account *202 to take into account possible outstanding checks or deposits in transit. Petitioner did not identify any outstanding checks or deposits in transit. If there were any, petitioner could have done so. The possibility of such items does not detract from the correctness of respondent's method. c. Petitioner's 1977 Mercury
Petitioner paid $ 400 for a 1977 Mercury in 1983. Respondent included it as an asset of petitioner at the end of 1983. Petitioner contends that respondent should not include it in petitioner's net worth because it belonged to his son. We disagree. Petitioner paid $ 400 for the car on April 1, 1983, and titled it in his name. There is no evidence that petitioner had any other car in 1983. Petitioner testified that his son bought and paid for the 1977 Mercury. Petitioner testified that he took title to the car to conceal from the insurance company that it belonged to a minor because it would have cost too much for a minor. Petitioner did not offer any other evidence or call his son to testify. The failure to call a witness may give rise to the presumption that, if called, the witness would testify unfavorably. Davis v. Commissioner, 88 T.C. 122, 143 (1987), *203 affd. 866 F.2d 852 (6th Cir. 1989); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We conclude that respondent properly included the 1977 Mercury in petitioner's net worth. 2. Purported Biggs Loan to Petitioner
The parties agree about the amount of petitioner's liabilities for 1983 but not for 1984. Petitioner testified that he received a $ 24,000 loan from Biggs in 1984. His testimony is uncorroborated. Petitioner argues that the custom among bookmakers is to not document loans and that Biggs died. Koesel testified: "I believe * * * [petitioner] said Leonard Biggs loaned him $ 14,000". However, Koesel also testified that petitioner first mentioned the Biggs loan only after respondent's examination began. Koesel never saw any documentation of the loan. Petitioner testified that he used the Biggs loan as a downpayment to buy a house. However, that testimony is inconsistent with petitioner's earlier testimony that Biggs lent him the money to keep petitioner in business. An equally plausible source of petitioner's downpayment *204 is petitioner's bookmaking income. Petitioner has not convinced us that Biggs lent him $ 24,000 in 1984. 3. Petitioner's Personal Living Expenses
Respondent used Bureau of Labor Statistics (BLS) data to calculate petitioner's personal living expenses for 1983 and 1984. Petitioner and respondent both used $ 13,270 as the amount of petitioner's personal living expenses in their net worth calculations for 1983. However, they used different amounts for 1984. Petitioner contends that his personal living expenses were $ 15,592 for 1984. Respondent argues that the expenses were $ 23,904. Petitioner argues that respondent improperly used BLS data for a two-person household to estimate his expenses for all of 1984. Petitioner and Guerrini were married on November 23, 1984. Respondent argues that a joint net worth statement is proper where a joint return is filed, citing United States v. Giacalone, 574 F.2d 328, 333 (6th Cir. 1978). Giacalone is distinguishable because in that case the taxpayer and his wife were married during the 4 years in issue. Id. There is no indication in Giacalone that the taxpayer and his wife were married *205 during only part of any of the years in issue. Respondent's other argument that petitioner, as Guerrini's fiance, "was certainly in a position to provide her with financial assistance" is mere speculation and not convincing. We conclude that petitioner's personal living expenses for 1984 were $ 15,592. 4. Guerrini's Assets and Income
a. 1974 Chevrolet
Respondent included in petitioner's net worth the 1974 Chevrolet that Guerrini bought for $ 500 around February 23, 1984. Petitioner contends that the 1974 Chevrolet should not be included in his net worth because Guerrini bought it before she married him on November 23, 1984. The cost of the Chevrolet would be counted in petitioner's net worth if he paid for it. We do not believe petitioner did so. In the first 11 months of 1984, Guerrini made regular deposits totaling $ 11,245 into her checking accounts. Respondent argues that petitioner was in a position to give financial assistance to Guerrini. However, we do not find that the car was connected to petitioner's unreported gambling income. We conclude that the 1974 Chevrolet should not be included in petitioner's net worth for 1984. b. Bank Accounts
Respondent *206 included all of the 1984 deposits into Guerrini's Ohio Savings Bank checking accounts in petitioner's net worth. Petitioner contends that this is improper because Guerrini and petitioner were married on November 23, 1984. The deposits would be counted in petitioner's net worth if he provided the funds for the deposits. We do not find that petitioner provided these funds. In light of our finding, we need not reach petitioner's argument that respondent failed to reconcile these accounts. c. Reduction in Liabilities for Guerrini's Mortgage Before She Married Petitioner
The parties agree that a taxpayer's net worth increases to the extent he or she reduces indebtedness during the year. Cleveland v. Commissioner, T.C. Memo. 1983-299 (citing Republic Supply Co. v. Commissioner, 66 T.C. 446 (1976), affd. without published opinion (10th Cir., Dec. 29, 1978)). However, they disagree about whether this principle should apply to Guerrini's mortgage liability for 1984. Respondent included the reduction in Guerrini's mortgage liability to Horizon for Guerrini's house from $ 11,613 to $ 10,085 in petitioner's net worth *207 for 1984. Petitioner contends that this is improper because Guerrini made the mortgage payments before she married petitioner. [6] Guerrini made two payments, one on December 4, 1984, and the other on December 28, 1984, which together reduced the principal by $ 108.84. She made all other payments in 1984 before she married petitioner. Respondent has not connected Guerrini's mortgage liability reduction to petitioner's unreported income, except to argue that petitioner was in a position to provide Guerrini financial assistance. We conclude that, except for $ 108.84, the reduction in Guerrini's mortgage liability in 1984 may not be considered in petitioner's net worth. d. Public Assistance Payments to Guerrini in 1984
Respondent reduced petitioner's 1984 economic income by $ 696 for public assistance payments to Guerrini. We do not count those *208 payments in petitioner's net worth calculation because Guerrini received them from January 1 to June 22, 1984, before she married petitioner. B. Additions to Tax for Fraud Under Section 6653(b)
1. Background
Respondent determined that petitioner is liable for additions to tax for fraud for 1983 and 1984. Under section 6653(b)(1), if the Commissioner proves that any part of an underpayment is attributable to fraud, an addition to tax applies to the entire underpayment. Sec. 6653(b)(1). The Commissioner has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). First, the Commissioner must prove the existence of an underpayment. Parks v. Commissioner, 94 T.C. 654, 660 (1990). The Commissioner may not rely on the taxpayer's failure to carry the burden of proof as to the underlying deficiency. Id. at 660-661; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). Second, the Commissioner must show that the taxpayer intended to evade taxes by conduct intended *209 to conceal, mislead, or otherwise prevent tax collection. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). 2. Underpayment
The Commissioner may prove the existence of an underpayment by proving a likely source of the unreported income, Holland v. United States, 348 U.S. at 137-138, or, if the taxpayer alleges a nontaxable source, by disproving the alleged nontaxable source, United States v. Massei, 355 U.S. 595 (1958). Here, respondent has shown that the source of petitioner's unreported income was petitioner's illegal bookmaking business. Petitioner argues that respondent's net worth calculation was so erroneous that respondent has not proven an underpayment of tax by clear and convincing evidence. Petitioner relies on Cox v. Commissioner, T.C. Memo. 1985-324. In Cox, we held that the Commissioner did not establish the taxpayer's net worth due to numerous significant errors in *210 applying the net worth method. Here, respondent offered prima facie evidence of petitioner's net worth. We made adjustments to correct for respondent's errors. Respondent's errors are not so significant that the net worth method is invalid. 3. Fraudulent Intent
Respondent must prove by clear and convincing evidence that petitioner had fraudulent intent. Parks v. Commissioner, supra at 664. For purposes of section 6653(b), fraud means actual, intentional wrongdoing, Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), or the intentional commission of an act for the specific purpose of evading a tax believed to be owing, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Fraud may be proven by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The courts have developed *211 a number of objective indicators or "badges" of fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Several badges of fraud are present in this case: (a) Large understatements of income, (b) inadequate records, (c) income from illegal sources, (d) dealings in cash, (e) implausible or inconsistent explanations of behavior, and (f) failure to supply complete information to the return preparer. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Ruark v. Commissioner, 449 F.2d 311, 312-313 (9th Cir. 1971), affg. T.C. Memo. 1969-48. a. Large Understatements of Income
A pattern of consistent underreporting of income for several years, especially with discrepancies of 100 percent or more between actual net income and net income reported on tax returns, is a badge of fraud. Holland v. United States, 348 U.S. at 137-139; Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37 *212 and T.C. Memo. 1970-144; Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938). Petitioner reported income of $ 19,832 in 1983 and $ 23,073 in 1984. He underreported his income by $ 16,724 in 1983 and $ 36,590 in 1984. b. Inadequate Records
A taxpayer's failure to maintain accurate records is a badge of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Reaves v. Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C. 690 (1958). Petitioner offered no records other than his handwritten summary sheets that he conceded included false daily summaries. Petitioner testified that the weekly totals in the handwritten summaries that he gave to Koesel were accurate. However, petitioner's bank deposits differed from the gross receipts that he wrote on his summaries by $ 11,169.63 in 1983 and $ 34,394.99 (not including the $ 14,621.09 gift from petitioner's father) in 1984. Except for petitioner's testimony, *213 there is no evidence that the weekly totals in the handwritten summaries are correct. Petitioner testified that he had no business records other than his handwritten summaries, checks, and bank statements. He gave Koesel only the handwritten summaries and the bogus Form 1099 for 1984. c. Income From Illegal Sources
A taxpayer's receipt of illegal income is a badge of fraud. Bradford v. Commissioner, supra at 308. Petitioner's income in 1983 and 1984 was from illegal bookmaking and card games. d. Dealing in Cash
Petitioner dealt extensively in cash largely to avoid scrutiny of his finances, a factor which can suggest fraud. Id. Petitioner did not deposit all of his cash in bank accounts because it would alert Government authorities. e. Implausible or Inconsistent Explanations
Implausible or inconsistent explanations by the taxpayer can show fraudulent intent. Id. Many of petitioner's explanations were inconsistent. For example, he testified that his checking accounts corroborated his handwritten summaries. However, as discussed above, his handwritten summaries differed from his bank deposits (excluding gifts) by *214 $ 11,169.63 in 1983 and $ 34,394.99 in 1984. Petitioner testified that Biggs lent him the money to keep him in business. However, he also testified that he used the proceeds from the purported Biggs loan as a downpayment to buy a house when he already owned another. He also testified inconsistently about the amount of cash that he needed to run his business. As discussed above, we found much of petitioner's testimony lacked credibility. We are not convinced that petitioner intended to report all of his illegal income and conceal only the fact that it was from an illegal source. Petitioner intended to conceal the source and amount of his income. Petitioner testified that he pleaded guilty to violating section 7206(1) only because he wanted to protect his wife from criminal prosecution. This explanation is unconvincing. Other than petitioner's testimony, there is no evidence that respondent may have sought criminal charges against Guerrini. Respondent determined that Guerrini was an innocent spouse under section 6013(e). f. Incomplete Information to Tax Return Preparer
A taxpayer's failure to give complete information to his or her tax return preparer about the amount *215 of the taxpayer's income and expenses may be a badge of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63. We believe that petitioner failed to disclose all of his income to Koesel and gave Koesel false information about the source of petitioner's income. Petitioner argues that the bogus Form 1099 shows that he intended to provide Koesel information about all of his income so that Koesel would include all of petitioner's income on his tax return. We believe petitioner thought that he could not conceal all of his income, so he tried to hide much of it. The bogus Form 1099 was part of petitioner's subterfuge. We conclude that respondent has established by clear and convincing evidence that petitioner intended to evade tax. C. Substantial Understatement of Tax Under Section 6661
Respondent determined that petitioner is liable for the addition to tax for substantial understatement of income tax under section 6661. If assessed after October 21, 1986, the addition is 25 percent of any underpayment attributable to the understatement. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498 (1988). *216 A substantial understatement is one which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). The Commissioner may waive this addition to tax if the taxpayer had reasonable cause for the understatement and acted in good faith. Sec. 6661(c). Petitioner contends that he did not substantially understate his income for 1983 and 1984. Petitioner raises no other defense. We hold that petitioner is liable for the addition to tax under section 6661 if the Rule 155 computation shows that there is a substantial understatement. D. Statute of Limitations
Petitioner contends that the statute of limitations bars assessment for 1984 because petitioner did not sign Form 872 to extend the time for assessment. We disagree. Respondent may assess tax at any time because, as we have held above, petitioner filed a false return with intent to evade tax. Sec. 6501(c)(1). To reflect the foregoing, [7]
*217 Decision will be entered under Rule 155. Appendix Net Worth Computation: 1983 Assets
Jan. 1, 1983
Dec. 31, 1983
Cash on hand
$ 10,000
$ 10,000
Cash in banks
Society #300-007-8585
473
99
Society #30-141-7738
100
1,602
1977 Mercury
400
7406 Avon Drive
44,344
Total assets
10,573
56,445
Liabilities
Mortgage payable:
Joe Martinez
22,545
Total liabilities
0
22,545
NET WORTH
10,573
33,900
Net worth increase
23,327
ADD: personal living expenses
13,270
Economic income
36,597
Statutory adjustments:
Adjusted gross income as corrected
36,597
Adjusted gross income per return
19,832
Understatement of adjusted gross income
16,765
Net Worth Computation: 1984
Assets
Jan. 1, 1984
Dec. 31, 1984
Cash on hand
$ 10,000
$ 10,000 Cash in banks
Society #300-007-8585
99
1,233 Society #30-141-7738
1,602
107 Society #30-143-6996
0
757 1984 Lincoln
0
19,791 1977 Mercury
400
0 7406 Avon Drive
44,344
54,925 11555 Caves Road
0
101,000 1196 Orchard Heights
27,000
27,000 Total assets
83,545
214,813 Liabilities
First Federal #28-0838362-2
0
50,857 Horizon #11-0029662-9
(reduction)
109
0 Mortgage payable:
Joe Martinez
22,545
21,087 Accum. depreciation Avon
0
527 Total liabilities
22,654
72,471 NET WORTH
60,891
142,342 Net worth increase
81,451 ADD: personal living expenses
15,592 Economic income
97,043 Statutory adjustments:
Gift from S. Klemm
(26,000)
Gift from J. Tutolo
(14,621)
Adjusted gross income as corrected
56,422 Adjusted gross income per return
19,832 Understatement of adjusted gross income
36,590 *218 Footnotes
1. Fifty percent of the interest due on $ 4,636.94.↩
2. Fifty percent of the interest due on $ 14,977.31.↩
1. The parties do not explain why the $ 50,000 downpayment and the $ 52,100 mortgage do not equal the $ 101,000 purchase price that petitioner and Guerrini paid for the home.↩
2. Our conclusions of petitioner's unreported income for 1983 and 1984 are shown in calculations in the appendix. Although our calculation shows that petitioner received $ 16,765 in unreported income in 1983, we sustain respondent's determination of the lesser amount of $ 16,724.↩
3. Respondent contends that petitioner did not provide any information about his cash on hand. Petitioner contends that respondent's agents never asked for information about cash on hand. The record is not clear about whether respondent asked for this information. Carl Lindblom testified at trial but he was not respondent's first agent assigned to the case. He assumed that another agent had asked this question earlier and that petitioner was seeking documentation.↩
4. Respondent called Koesel as a witness.↩
5. Petitioner argued at trial that respondent's net worth method improperly forces him to prove a negative assertion and that cases from the Court of Appeals for the Sixth Circuit such as United States v. Walton, 909 F.2d 915, 918-919 (6th Cir. 1990); United States v. Besase, 623 F.2d 463, 465 (6th Cir. 1980); and Weir v. Commissioner, 283 F.2d 675, 679 (6th Cir. 1960), revg. and remanding T.C. Memo. 1958-158↩, apply here. We disagree and conclude that those cases do not apply, because petitioner must prove his assertion that he had $ 40,000 in cash on Jan. 1, 1983.
6. Although petitioner argues that the Horizon account should not be included in his net worth, the net worth computation in petitioner's answering brief included it.↩
7. Petitioner raised other arguments in his petition, such as: (1) Additions to tax for fraud under sec. 6653(b) violated the double jeopardy clause of the U.S. Constitution; (2) respondent failed to waive the additions to tax under sec. 6661; and (3) respondent improperly disallowed an $ 868 medical deduction. Petitioner has not advanced those positions on brief, and we deem them to be abandoned. See Rule 151(e); Wilcox v. Commissioner, 848 F.2d 1007, 1008 (9th Cir. 1988), affg. T.C. Memo. 1987-225; Rockwell Intl. Corp. v. Commissioner, 77 T.C. 780, 837 (1981), affd. 694 F.2d 60↩ (3d Cir. 1982).