623 F.2d 463
 80-2 USTC P 16,343
 UNITED STATES of America, Plaintiff-Appellant.
v.
John BESASE, George Besase, Sam Besase, Angelo Perna, Sam
Rappaport, Ted Maison, Defendants-Appellees,
Estate of Joseph Besase, Josephine Besase, Lucas County
State Bank, Cissie Rappaport, First Federal Savings and Loan
Association, Anna Perna, Toledo Home Federal Savings and
Loan Association, Thelma Kritzer, Sylvania Savings Bank,
Rosemarie Besase, Anthony Besase, Jr., George S. West, and
Pauline A. West, Defendants.
 No. 78-3047.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 5, 1980.
Decided June 17, 1980.
Rehearing Denied July 25, 1980.
 
 James R. Williams, U. S. Atty., Patrick J. Foley, Asst. U. S. Atty., Toledo, Ohio, M. Carr Ferguson, Gilbert E. Andrews, Francis J. Gould, Carleton D. Powell, Dept. of Justice, App. Section, Tax Div., Washington, D. C., for plaintiff-appellant.
 John Kennedy Lynch, Cleveland, Ohio, David G. Wise, Lawrence E. Duffey, Toledo, Ohio, Norman E. Bischoff, Sylvania, Ohio, for defendants-appellees.
 Before CELEBREZZE, MERRITT and JONES, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 The government appeals the dismissal of its civil action to collect wagering excise taxes, fraud penalties, and interest from the defendants. The government contends the defendants failed to report and pay tax on all of their gross income from a numbers operation. Two issues are presented: (1) did the District Court correctly allocate the burden of proof between the parties; and (2) did the District Court correctly conclude that the government had failed to carry its burden with respect to any of the defendants. We affirm with respect to all of the defendants except three. In those three cases we reverse.
 
 I.
 
 2
 During the tax years involved in this case, the Internal Revenue Code imposed an excise of ten per cent on the gross amount of wagers. 26 U.S.C. § 4401(a). For fraudulent deficiencies, the Code additionally affixed a civil penalty amounting to fifty per cent of the excise. 26 U.S.C. § 6653(b). All persons engaged in the business of accepting wagers were subject to the tax. 26 U.S.C. § 4401(c). Such persons were required to identify themselves yearly by registering with the Internal Revenue Service. 26 U.S.C. § 4412(a).
 
 
 3
 The defendants, each of whom was a self-avowed numbers operator, registered annually in the form of three separate partnerships. George Besase and John Besase filed their registration form as partners. Joseph Besase joined them until his mid-1963 death. Sam Besase and Angelo Perna likewise registered together as partners. Sam Rappaport and Ted Maison filed as a third partnership. Each partnership claimed to operate a separate numbers game.
 
 
 4
 At stake for players of the numbers games was a jackpot that could be won by correctly guessing a three-digit number. The winning number would be derived from afternoon stock market reports. After the number and winners were determined, and payoffs made, the partners would split the remaining proceeds.
 
 
 5
 The three partnerships each filed separate monthly wagering tax returns. Between January 1, 1961, and October 23, 1963, the combined monthly gross income reported by the three partnerships ranged from approximately $5,000 to $10,000.
 
 
 6
 The government claims that the defendants actually operated a single partnership which earned a monthly gross income of approximately $145,000. According to the government, the alleged partnership was in business from January 1, 1961, through October 23, 1963, but did not report or pay any wagering tax liability. The government assessed over one million dollars in wagering excise taxes, fraud penalties and interest[1] on the income allegedly derived from the unregistered single partnership, and sought to reduce this amount to judgment in the District Court.[2]
 
 II.
 
 7
 The District Court, at a bench trial, placed the ultimate burden of persuasion on the government. An initial presumption of correctness applies to assessments. Sharwell v. Commissioner of Internal Revenue, 419 F.2d 1057, 1060 (6th Cir. 1969). At the outset, therefore, taxpayers usually have the burden of producing evidence to refute the validity of an assessment. See Foster v. Commissioner of Internal Revenue, 391 F.2d 727, 735 (4th Cir. 1968).
 
 
 8
 The District Court allowed the defendants to shift the burden of proof back to the government simply by producing evidence from which it could be found that the assessment was incorrect. Thereafter the government had to substantiate the validity of its claims, and bore the risk of non-persuasion. The impracticality and inequity of requiring a taxpayer to prove a negative allegation such as the non-existence of a common partnership, said the District Court, warranted the lighter burden of defendants' proof.
 
 
 9
 The government challenges two aspects of the burden of proof formula. First the government argues that, regardless of the nature of a taxpayer's proof, taxpayers always must disprove the validity of an assessment by a preponderance of the evidence. Only with respect to fraud penalties does the government concede that it bears the ultimate burden of persuasion by a preponderance of the evidence. Secondly, the government insists that it was not the existence of a common partnership that the defendants had to disprove, but rather the non-receipt of income. The proof tied each defendant to the underlying gambling operation, says the government, and thus made each defendant individually and personally liable for the taxes due. According to the government, then, both the formulation and the stated object of the burdens of proof were wrong.
 
 
 10
 The District Court correctly allocated the relative burdens of proof. This is an action to collect a tax assessment. In such cases, this Court consistently has given the assessment an initial presumption of validity. See Sharwell v. Commissioner of Internal Revenue, 419 F.2d at 1060. It devolves at once upon the taxpayer to challenge the assessment. Id. Where it is a negative assertion that a successful taxpayer would have to prove though, the "law imposes much less of a burden upon a taxpayer." Weir v. Commissioner of Internal Revenue, 283 F.2d 675, 679 (6th Cir. 1960). Reasonable denials of the assessment's validity have sufficed in such cases to shift the burden back to the government. Id. The government then bears the task of substantiating its assessment in cases of this type.
 
 
 11
 As in Weir the defendants ultimately had to prove their non-receipt of income in order to prevail. They denied the existence of, and the receipt of income from, a common partnership. They characterized the nature of their relationship as social, and offered testimony to support the explanation. The nature of their proof justified use of the lighter burden and allocation of the ultimate risk of non-persuasion to the government. See generally C. McCormick, Handbook of the Law of Evidence § 378; J. Wigmore, Evidence § 2485 (discussing apportionment considerations).
 
 
 12
 Indeed, the burden of proof could not otherwise have been allocated without risking a violation of defendants' privilege against self-incrimination. In Grosso v. United States, 390 U.S. 62, 65-69, 88 S.Ct. 709, 19 L.Ed.2d 706 (1968), the Supreme Court ruled that the Fifth Amendment privilege against self-incrimination precluded federal criminal prosecution for failure to file the required wagering tax forms. At the basis of the Court's decision was the Hobson's choice that federal wagering tax laws pose to gamblers. Before the Grosso decision, a gambler had no choice but to file returns and pay the tax and possibly incriminate himself under state law, or not comply and possibly incur a federal penalty. To preserve the efficacy of the self-incrimination privilege, the Court prohibited the imposition of certain criminal sanctions for failure to comply with the wagering tax laws.
 
 
 13
 The choice between self-incrimination and undue forfeiture looms no less ominously in the context of a civil action to collect the wagering excise. A gambler who wants to challenge the correctness of an assessment runs a high risk of incriminating himself under state law. The government, for example, erroneously may impose a wagering tax assessment of $20,000 when, in fact, the taxpayer owes only $10,000. To show error in the assessment, the taxpayer may have no choice but to divulge the inculpating details of his wagering operation and thus expose himself to state prosecution.[3] If a prudent gambler decides not to challenge the assessment lest he invite a state criminal prosecution, he often averts self-incrimination only at the cost of unwarranted tax liability. To allow a gambler to disprove the validity of a wagering tax assessment only by a preponderance of the evidence could penalize the exercise of the privilege against self-incrimination in a manner that the Supreme Court outlawed in Grosso.
 
 
 14
 The burden of proof used by the District Court accommodates both the privilege against self-incrimination and the presumption of accuracy normally accorded to government tax assessments. It neither forces the protesting taxpayer to expose himself to state criminal liability nor robs the government of the advantage gained by the initial presumption. It merely spares the taxpayer from the threat of self-incrimination by requiring the government to justify its claim. Accordingly, we find no error in the apportionment of the burden of proof by the District Court.
 
 III.
 
 15
 At trial, the ultimate factual question was whether the defendants had operated a common gambling partnership that received wagering income from January 1, 1961, through October 23, 1963. The District Court found the evidence insufficient to establish the existence of the alleged syndicate, and dismissed the case on the merits. We believe that portions of this finding were clearly erroneous.
 
 
 16
 The government based its income estimate and common partnership theory on evidence seized in a surprise raid by investigative agents of the Internal Revenue Service. The object of the raid was the apartment building at 2031 West Alexis Road in Toledo, Ohio. Several of the defendants and their relatives had built and lived in the building since the late 1940s.
 
 
 17
 The raid occurred at 3:00 P.M. on Wednesday, October 23, 1963, following several days of surveillance. Investigators saw each of the defendants (except Joseph Besase, who was dead) and several other persons entering and leaving the building, usually at mid-afternoon, during the surveillance period. All but one of the living defendants, plus several other persons, were in the building at the time of the raid.
 
 
 18
 Agents found four of the defendants inside a concealed countroom. The countroom, hidden behind a removable panel in a bedroom closet, was on the top floor of the two-story building. George and Sam Besase, Angelo Perna and Sam Rappaport were there. John Besase was in the adjacent bedroom. Only Ted Maison, who on earlier occasions had been observed entering and leaving the premises, was not present in the building.
 
 
 19
 On tables and in closets around the room, agents found several stacks of numbers slips, several thousands of dollars in cash, several adding machines and adding machine tapes. During the raid, the telephone in the countroom rang. The caller unwittingly, and belatedly, advised the IRS agent who answered the phone that a raid was about to occur. A notebook containing a mixture of utility bills addressed to various of the defendants and their alleged employees also was discovered. The telephone number of the accountant for two of the defendants' duly registered partnerships was spotted on a piece of insulation tape. In addition to the defendants, several other persons also were present in the countroom or contiguous bedroom. Harold Bonta, a non-defendant who was in the countroom, told the agents that he alone was responsible for the countroom. Pursuant to the raid, the agents arrested Bonta and the present defendants.
 
 
 20
 At trial, the defendants who testified denied any prior knowledge of the use of the concealed room, and disclaimed the existence of a common partnership. According to the defendants, they knew each other socially, and met occasionally in a first-floor recreation room at 2031 West Alexis Road. There they would play cards or discuss sports events while awaiting news reports of stock market closing statistics. The defendants who testified insisted that, when the raid began, they fled upstairs in fright and came upon the hidden room. They further maintained that they had reported and paid all wagering tax liability on their partnership returns.
 
 
 21
 As to four of the defendants, we find no error in the District Court conclusion that the evidence was insufficient to establish participation in or receipt of income from the alleged common partnership. The only evidence of John Besase's alleged involvement in the countroom operation is his presence just outside the hidden room. There was no credible pertinent evidence against the late Joseph Besase except his association with George and John Besase in the registered partnership, for which returns properly were filed. The relevant evidence against George Besase, who was found in the countroom, consists of a blank tax form addressed to G & J Besase (his wife's name was Josephine and his living partner's name was John) and three utility bills for his personal residence that were found in the countroom. The evidence against Angelo Perna consists mainly of his presence in the countroom at the time of the raid. The registration form filed by each of these defendants lists 2031 West Alexis Road as the home address. The proof against these defendants, however, does not convincingly tie them to any common partnership or establish their receipt of income beyond that which they duly reported in the tax returns of this registered partnership.
 
 
 22
 As to defendants Sam Besase, Ted Maison and Sam Rappaport, we believe that the evidence clearly ties them to the countroom operation. Sam Besase was found in the countroom at the time of the raid. The countroom telephone was registered in his name. A numbers runner named John Spencer testified that he occasionally would deliver numbers slips to Sam Besase. Spencer also testified that when he anticipated a late delivery of his numbers slips, he would call the countroom and ask for "Sam." A person whose voice he identified as that of Sam Besase would answer. In addition, Spencer identified numbers slips found in the countroom as ones he had written for and delivered to Sam Besase.
 
 
 23
 The proof against Ted Maison ties him also to the countroom operation. Maison was not present at 2031 West Alexis Road at the time of the raid. Yet IRS agents saw him entering and leaving the building during their pre-raid surveillance. At an earlier trial, the transcripts of which were introduced in the present proceeding, Mary Bilecki identified certain numbers slips seized from the countroom as slips she had written for and delivered to Maison.
 
 
 24
 The evidence against Sam Rappaport is likewise compelling. Rappaport was in the countroom at the time of the raid. On his person were pieces of paper containing the countroom telephone number and codes identical to those on various numbers slips stacked around the countroom. Spencer, the runner, testified that he occasionally delivered numbers slips to Rappaport, whose registration form claimed no employees. As with Sam Besase and Ted Maison, the evidence against Sam Rappaport establishes his connection with the countroom operation.
 
 
 25
 In summary, the finding of the District Court regarding George Besase, John Besase, Joseph Besase and Angelo Perna is not clearly erroneous. The government, however, carried its burden of proof with regard to Sam Besase, Ted Maison and Sam Rappaport. Insofar as the District Court judgment relieves Sam Besase, Ted Maison and Sam Rappaport of liability for the wagering tax on income earned by the countroom operation, we therefore reverse.
 
 IV.
 
 26
 The government computed the defendants' countroom income by the "projection of daily earnings" method. From the countroom, IRS agents seized numbers slips written on the day of the raid and the three previous betting days. Adding machine tapes that recorded the receipts for the four days also were found. Totals on the tapes indicated that the average daily receipts for the countroom numbers operation were $6,625.42. The government projected the income and tax liability of the defendants from this four-day average. The defendants, who steadfastly denied any connection to the countroom and thus introduced no business records or other evidence to contradict the income extrapolation, did not object to the projection of income method.
 
 
 27
 In the absence of business records or other pertinent evidence, the government has the right to rely on the best available evidence to determine a taxpayer's income. See United States v. Firtel, 446 F.2d 1005, 1006-07 (5th Cir. 1971). In several wagering tax assessment cases, we have countenanced the use of the projection method. See, e. g., Hallabrin v. Commissioner of Internal Revenue, 325 F.2d 398, 401 (6th Cir. 1963). There being no evidence to cast doubt on the projected amount of income, the government thus has met its burden of proof in establishing the amount of unreported income.
 
 
 28
 The proof also establishes that the wagering tax underpayments on this income were due to fraud. Because the District Court found no tax liability, it did not reach this question. The government, however, met its burden of proving fraud. The three defendants consistently failed to report substantial amounts of wagers for several years. They sought to conceal the countroom and the receipts from the operation. They kept no adequate records of the countroom's receipts. In view of these considerations, we believe that the government clearly established, by a preponderance of the evidence, that the underpayments were fraudulent. See Adler v. Commissioner of Internal Revenue, 422 F.2d 63, 67 (6th Cir. 1970); Friedman v. Commissioner of Internal Revenue, 421 F.2d 658, 659 (6th Cir. 1970). To the defendants' tax liability, therefore, a fifty per cent fraud penalty properly was added. See 26 U.S.C. § 6653(b).
 
 
 29
 The judgment of the District Court therefore is affirmed in part and reversed in part.
 
 
 
 [1]
 Upon entry of the judgment by the District Court, the unpaid balance on the assessment against all of the defendants for the period January 1, 1961, through June 30, 1963, was $925,804.98, which amount included a tax of $548,474.85, a penalty of $292,237.49 and an interest charge totalling $69,428.60. The unpaid balance on the additional assessment against all of the defendants except Joseph Besase, who died in mid-1963, was.$121,748.80 which amount included $79,526.28 in taxes, $39,763.15 in penalties, and $2,459.37 in interest
 
 
 [2]
 The District Court previously dismissed this case after ruling that the search warrant pursuant to which the government had seized evidence was invalid. This Court reversed and remanded for trial. See United States v. Besase, 521 F.2d 1306 (6th Cir. 1975). Prior to the present civil action, the government had sought to convict these same defendants except Joseph Besase, who had died of wagering excise tax evasion. Although the government won a conviction based on the same set of circumstances as the current case presents, this Court reversed. See United States v. Besase, 373 F.2d 120 (6th Cir. 1967). The reversal was based on the failure of the government to introduce evidence establishing that the alleged partnership had failed to file excise tax returns
 
 
 [3]
 Cf. Ohio Rev.Code § 2915.02(A)(5) (Baldwin's 1974) ("No person shall . . . (w)ith purpose to violate . . . this section, acquire, possess, control, or operate any gambling device")