**SMOKY MOUNTAIN SECRETS, INC., Plaintiff**

v.

**UNITED STATES of America, Defendant.**

No. 3:94–cv–121.

United States District Court, E.D. Tennessee.

Sept. 28, 1995.

James M. McCarten and Dale C. Allen, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN, for Smoky Mountain Secrets, Inc.

Michael J. Martineau, Trial Attorney, U.S. Department of Justice, Tax Division, Washington, DC, for the U.S.

## MEMORANDUM OPINION

JARVIS, District Judge.

This is a tax refund action brought by the plaintiff-taxpayer, Smoky Mountain Secrets, Inc. (SMS), pursuant to 28 U.S.C. § 1346(a)(1). Plaintiff seeks a refund of Form 941, Federal Insurance Contribution Act (FICA) taxes and Form 940, Federal

Unemployment Tax Act (FUTA) taxes, which plaintiff contends were assessed erroneously by the United States Department of the Treasury through the Internal Revenue Service (IRS). The total amount of taxes assessed[1] is approximately $3,888,918. This does not include interest on the assessments. The jurisdiction of this court is not disputed. This matter was tried before the undersigned without intervention of a jury on July 20, 1995. The parties were given additional time within which to file post-trial briefs. After consideration of the pleadings, the testimony of witnesses, the depositions and exhibits introduced at trial, the parties' briefs and the applicable law, the court makes the following findings of fact and conclusions of law. *See* Rule 52(a), Federal Rules of Civil Procedure.

## Findings of Fact

1. SMS, a Tennessee corporation, markets gourmet foods and condiments, including mustards, salad dressings, jellies and preserves. SMS sells its gourmet foods to consumers; it does not package and sell its products to other businesses for resale.

2. Sometime during late 1991 or early 1992, defendant, through the IRS, initiated an audit of SMS which included a review of whether SMS's telemarketers and delivery persons were properly treated as independent contractors for federal tax purposes.

3. During the tax years in question, the bulk of SMS's sales orders were solicited through telephone calls made by plaintiff's telemarketers, although some sales were made through mail orders received from repeat customers and through on-the-spot sales by delivery persons. The product orders solicited by the telemarketers were delivered to the customer's home by delivery persons who collected the amount due.

4. In addition to the telemarketers and delivery persons, all of whom were treated

other than as employees for federal tax purposes during the 1989 and 1990 tax years, SMS employed workers who were and still are treated as employees for federal tax purposes. These employees include home office staff, warehouse workers, office managers, regional managers, and the officers of the corporation.

5. The telemarketers and delivery persons worked out of sales offices in various locations in approximately 14 different states during the tax years in question. No walk-in sales were made from these offices. Sales were only made through telephone solicitation and delivery of the package. For each package sold, which SMS defined as requiring actual delivery to and receipt of payment from the customer, the telemarketer received a specific commission, the amount of which depended upon the size of the package sold and the year in which the transaction took place.

6. SMS's delivery persons were an integral part of SMS's sales force; their services did not consist of merely driving to the customer's home and handing over the package. The delivery person had to collect the amount due, which often meant that he or she had to close the sale. Neither the delivery person nor the telemarketer would be paid unless the package was accepted and paid for by the consumer. Thus, the reason SMS's own delivery persons were used instead of common carrier was to obtain the opportunity to close the sale face-to-face if a delivery was refused. Two of plaintiff's managers, Terry P. Goodall and Barbara Jean Thomas,[2] each of whom had previously worked for SMS as delivery persons, testified that the person delivering the packages was often called upon to close sales, such as when a customer has changed his or her mind, did not know the terms of the sale, or when an unknowledgeable spouse refused to

1. Smoky Mountain Secrets has not actually paid the amounts assessed. Rather, it has for each assessment paid an amount equal to the employment taxes for one employee and immediately sought a refund of that amount. There were a total of 10 assessments beginning with the first quarter of 1989 and ending with the last quarter of 1992. This procedure is in full compliance with the IRS' divisible tax rule. Each claim for refund has been disallowed by the IRS. These

and other facts are included in written stipulations [Doc. No. 25] filed by the parties.

2. The parties stipulated that the testimony given by Mr. Goodall and Ms. Thomas is consistent with that of all office managers, telemarketers and/or delivery persons working with SMS during the tax years in question, both with regard to SMS's corporate policies and the work of telemarketers and delivery persons.

accept the package. Mr. Goodall and Ms. Thomas further testified that delivery persons also made sales on a "show-me" basis, in which additional packages are shown and sold to customers and to their neighbors. Consequently, I find that closing the sale was as much an art as was obtaining the order over the telephone in the first place.

7. Before going to work for SMS, each telemarketer and delivery person was required to sign a written contract. SMS's company president, Charles H. Allen, who along with his wife, Lois Allen, own 100% of the issued and outstanding stock of SMS, testified that it was corporate policy that all salespersons sign a contract before beginning work. The evidence establishes that the contracts clearly set forth that each telemarketer or delivery person would be paid on a commission basis, would not be treated as an employee for federal tax purposes, and that no federal, state or local income or payroll taxes would be withheld. The earlier forms of the contracts also stated that because the telemarketer or delivery person was not an employee, a Form 1099 would be issued and filed if the individual earned over $600 during that year. The parties stipulated that SMS issued a Form 1099, as required by federal tax law, to every telemarketer and delivery person who earned $600 or more during the 1989 and 1990 tax years.

8. These written contracts further provided that each telemarketer's or delivery person's remuneration was directly related to the number of sales delivered and for which they were paid. Each year SMS corporate policy required every telemarketer and delivery person to sign a new contract. It was the responsibility of the manager of each sales office to obtain those documents. And, in fact, the contracts were signed by every telemarketer and delivery person before they started work.

9. Copies of form contracts between SMS and its telemarketers and delivery persons which were used during the years following the 1989 and 1990 tax years were admitted in evidence. As the undisputed testimony confirms, the contracts used in prior years were, in all relevant provisions, substantially the same as those in evidence. The contracts used in the 1989 and 1990 tax years provided that the service provider—*i.e.,* the telemark-

eter or delivery person—would be paid on a per-package-sold basis and that the service provider would not be treated as an employee for federal tax purposes. The parties stipulated, however, that SMS has been unable to produce and does not have in its possession originals or copies of the written contracts for the tax years in question, even though SMS diligently searched for them and even sought to obtain copies or originals from numerous third parties. The reason SMS was unable to obtain the contracts is that its certified public accountant (CPA), Edgar H. Gee, Jr., advised Mr. Allen, SMS's president, that it would be unnecessary to retain copies after the corporate books had been closed and the required tax returns, including Forms 1099, had been filed for the year. Mr. Gee did not consider it important to keep copies of the contracts between SMS and its sales force because 26 U.S.C. § 3508 does not address retention of contracts in any respect. Nonetheless, because it was SMS's corporate policy that every telemarketer and delivery person sign a new contract each year, and since the undisputed proof at trial indicated that contracts were, in fact, executed by all telemarketers and delivery persons during the tax years at issue, I find that SMS convincingly proved the existence of the contracts and their contents pursuant to Rule 1004(1), Federal Rules of Evidence.

10. Mr. Allen first sought Mr. Gee's advice in 1983, after having read a statement in a business publication which reported the addition of § 3508 to the Internal Revenue Code (the Code). Because he realized that it possibly applied to businesses such as his, which utilized the services of "direct sellers" and treated them as independent contractors, Mr. Allen sought the advice of Mr. Gee as to whether the new Code provision would apply to SMS's relationship with its telemarketers and delivery persons. Mr. Gee is a CPA who has been licensed and in practice for more than 20 years. He received his undergraduate degree in accounting from Western Kentucky University and a masters in Business Administration from the University of Tennessee at Knoxville. Mr. Gee started his professional career with what was then one of the Big Eight accounting firms. He has had his own practice since 1977. Mr. Gee

maintains a general accounting practice, concentrating on small businesses, the most significant of which is SMS. He testified at trial that probably one-half of his practice is related to tax accounting and tax advice.

11. Mr. Gee testified that when Mr. Allen first inquired about § 3508 he was initially unfamiliar with the statute's requirements. The reason is that the statute had only recently been enacted. He therefore obtained a copy of the new statute prior to Mr. Allen's initial appointment, found that there were no regulations regarding § 3508, and analyzed the Code section with Mr. Allen, asking him pertinent questions regarding each of the elements set forth in the statute. Based on the information gleaned from Mr. Allen, Mr. Gee opined that SMS's telemarketers and delivery persons were direct sellers as contemplated by § 3508. Mr. Gee testified that his opinion was based upon Mr. Allen's description of the relevant facts about SMS's business, the manner in which the telemarketers and delivery persons would be compensated, and the fact that plaintiff had a written contract with its sales force providing that the telemarketers and delivery persons would not be treated as employees for federal tax purposes. Shortly after his meeting with Mr. Allen, Mr. Gee researched § 3508's legislative history, obtaining copies of the Senate and House committee reports as well as the conference committee report. He gave copies of these reports to Mr. Allen, advising him that he remained of the opinion that SMS's sales force qualified as direct sellers under the statute. Mr. Gee was hired that same year as SMS's CPA with responsibility for closing the books at year-end, preparing financial statements as needed, and filing all tax returns, including employment tax and information returns.

12. Unknown to Mr. Gee, Mr. Allen also consulted with the CPA who regularly prepared Mr. Allen's personal tax returns, Jerry Lee Sharpe of Middlesboro, Kentucky. Mr. Allen asked Mr. Sharpe the same question regarding the proper tax classification of SMS's telemarketers and delivery persons. Mr. Sharpe, now semi-retired, has been a CPA since 1963. When he began his career, he worked for the IRS as a revenue agent for almost two years. While with the IRS, Mr. Sharpe worked on a number of independent contractor cases. As a CPA in private practice, the vast majority of his time has been spent on tax-related issues, including some work, primarily related to the coal industry, regarding the issue of independent contractors.

13. Like Mr. Gee, Mr. Sharpe advised Mr. Allen that he believed that SMS's telemarketers and delivery persons were properly classified as independent contractors and not employees. He based this advice, however, upon his prior experience and knowledge of common law factors. Mr. Sharpe was not familiar with and did not discuss with Mr. Allen the application of § 3508. Some years later, Mr. Sharpe called Mr. Allen regarding this issue after he had attended a three-day continuing professional education course, which was sponsored by the University of Kentucky and taught by IRS instructors. Mr. Sharpe advised Mr. Allen that the course's primary subject involved the IRS's new 20–factor analysis for determining whether workers are employees or independent contractors for federal tax purposes. After again analyzing SMS's sales force in the context of these 20 factors, Mr. Sharpe advised Mr. Allen that the telemarketers and delivery persons were properly characterized as independent contractors.

14. Mr. Gee has continued to perform certain accounting services for SMS since 1983. In addition to the specific advice he gave regarding § 3508, Mr. Gee has represented SMS in state unemployment tax investigations involving the issue of the proper classification of SMS's telemarketers and delivery persons. A number of such investigations took place over the years and, consistent with his initial advice to Mr. Allen, Mr. Gee has taken the position with the states that the telemarketers and delivery persons were statutorily classified as independent contractors. Mr. Gee testified that most, if not all, of these investigations resulted in findings by the states that SMS's telemarketers and delivery persons were indeed properly treated as independent contractors rather than employees.

15. Based upon the undisputed evidence at trial, I find that SMS has, since its inception, treated all of its telemarketers and de-

livery persons as independent contractors. No telemarketer or delivery person has been treated as an employee for federal tax purposes.

### Conclusions of Law

**A. Section 3508—Statutory Independent Contractors**

■ 1. This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1340 and 1346(a)(1), and 26 U.S.C. § 7422. Because this is a tax refund suit in which the IRS counterclaims for the unpaid balance of assessments of divisible taxes, the IRS need only show that a timely assessment was made in order to establish a prima facie case. *See Sinder v. United States,* 655 F.2d 729, 731 (6th Cir.1981). Thus, the assessment is initially presumed to be correct, and the taxpayer has the burden of proving that the assessment was wrong. *Id. See also United States v. Besase,* 623 F.2d 463, 465 (6th Cir.), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 605 (1980).

■ 2. Prior to 1982, the question of whether a worker was an independent contractor or an employee for federal tax purposes was a question that was answered almost exclusively under common law. *See Cleveland Institute of Electronics, Inc. v. United States,* 787 F.Supp. 741 (N.D.Ohio 1992); H.R.Rep. No. 1748, 95th Cong., 2d Sess. 5, 1978–3 C.B. (Vol. 1) 629 (House Report discussing the enactment of the employment tax relief provisions of § 530 of the Revenue Act of 1978). After enacting § 530 of the Revenue Act of 1978 as an interim solution for employment tax controversies, Congress in 1982 made § 530 relief permanent and, to further alleviate the problem for direct sellers and real estate sales persons, enacted 26 U.S.C. § 3508. According to the legislative history, Congress added § 3508 to the Code as a response to the "problems arising from increased employment tax status controversies," and to provide "a statutory scheme for assuring the status of certain direct sellers and real estate sales people as independent contractors [for federal tax purposes]." *Staff of Joint Comm. on Taxation,* 97th Cong., 2d Sess., General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982, at 382 (Comm. Print 1982). Importantly, the "stat-

ute did not supplant the common law; rather, it merely guaranteed independent contractor status for those taxpayers who met its conditions." *Cleveland Institute of Electronics,* 787 F.Supp. at 743–44.

3. Section 3508 thus establishes two categories of statutory non-employees: (1) qualified real estate agents and (2) direct sellers. The statute sets forth the general rule that an individual performing services as a "direct seller" shall not be treated as an employee and the person for whom the services are performed shall not be treated as an employer. § 3508(a)(1) and (2).

■ 4. The term "direct seller" is defined in pertinent part in § 3508(b)(2) as any person:

> (A) [who]
>
> \*    \*    \*    \*    \*    \*
>
> (ii) is engaged in the trade or business of selling (or soliciting the sale of) consumer products in the home or otherwise than in a permanent retail establishment,
>
> (B) substantially all the remuneration (whether or not paid in cash) for the performance of the services described in subparagraph (A) is directly related to sales or other output (including the performance of services) rather than to the number of hours worked, and
>
> (C) the services performed by the person are performed pursuant to a written contract between such person and the person for whom the services are performed and such contract provides that the person will not be treated as an employee with respect to such services for Federal tax purposes.

The parties have stipulated that SMS's sales (the delivery of its gourmet foods and condiments and receipt of payment) and the solicitation of its sales (by the telemarketers over the telephone) were made either in the home or from other than a "permanent retail establishment" as required by § 3508. The parties further stipulated that SMS's telemarketers were engaged in the business of "soliciting the sale" of plaintiff's product as required by the statute. However, the parties dispute whether or not SMS's delivery

persons were engaged in the business of soliciting the sale of plaintiff's products. I am of the opinion that they were. In fact, SMS's delivery persons were an indispensable part of selling SMS's products. Delivery persons had to be able to and did "close" sales on a regular basis. Indeed, the extent to which they received remuneration for their services was very often dependent on their success in closing sales. The telemarketers and delivery persons thus both clearly meet the first prong of the definition of "direct sellers;" they were engaged in the trade or business of selling or soliciting the sale of consumer products in the home or otherwise than in a permanent retail establishment.

■ 5. The next criterion which must be satisfied under § 3508 is that "substantially all the remuneration" paid to the worker be directly related to sales or other output rather than the number of hours worked. SMS compensated its telemarketers and delivery persons on a commission basis—only if a package was delivered to a customer and the sales price actually collected were the telemarketer and delivery person to be paid. Thus, substantially all of the remuneration of the telemarketers who received a Form 1099 for the 1989 and 1990 tax years was directly related to sales. Similarly, substantially all the remuneration of SMS's delivery persons during the 1989 and 1990 tax years was directly related to sales. SMS has thus met the second prong of § 3508's test.

■ 6. The third requirement of § 3508 is that the services must have been performed pursuant to a written contract providing that the service provider would not be treated as an employee for federal tax purposes. Although the IRS vigorously contends that SMS has failed to satisfy the written contract requirement of § 3508(b)(2)(C), its argument is unavailing. The IRS would require plaintiff to actually produce the written contracts for the years 1989 and 1990. However, this argument ignores Federal Rule of Evidence 1004(1), which clearly allows other evidence of the contents of an original writing to be introduced assuming all originals have been lost or destroyed. While Congress could have required something more within the terms of § 3508, it did not. The IRS has failed to cite any authority for the proposition that copies of the original contracts must be produced in order for the taxpayer to meet the third prong of § 3508. SMS introduced into evidence copies of form contracts similar in every material respect to those used in the tax years at issue. The contracts specifically provide that SMS's telemarketers and delivery persons will be paid on a commission basis and that the telemarketers and delivery persons would not be treated as employees for federal tax purposes. SMS required each telemarketer and delivery person to sign these contracts and the evidence clearly reflects that the contracts were, in fact, signed by each telemarketer and delivery person in each of the tax years at issue. Therefore, the third requirement of the statute has been met; the services were performed under a written contract providing that the service provider would not be treated as an employee for federal tax purposes.

7. The IRS also contends that the court may reasonably infer from the existence of written contracts for years *subsequent* to 1989 and 1990, and the failure of SMS to produce the written contracts for the years at issue, that either no written contracts ever existed for such years or that, if they did exist, the written contracts did not contain the express provisions required by § 3508. Indeed, the IRS goes so far as to argue that the court may properly draw an analogy between the established principle that an adverse inference may be drawn from the failure of a non-hostile witness with direct knowledge of important facts to testify on a party's behalf. While the court could draw such an inference if SMS had adduced no proof on this issue, that is not the case here. The government itself stipulated that any and all persons whom SMS could call at trial on this issue would testify, as did Mr. Goodall and Ms. Thomas, that each telemarketer and delivery person signed written contracts as a matter of corporate policy. As noted in the leading case of *Cleveland Institute of Electronics, Inc.*, 787 F.Supp. at 749, the legislative purpose underlying enactment of § 3508 was to reduce the number of controversies regarding employment and income tax status of direct sellers and real estate agents. The court therefore must interpret the require-

ments of § 3508 in a fashion which will further the statute's purpose. Therefore, because SMS has clearly demonstrated that its telemarketers and delivery persons meet the requirements set forth in § 3508, the court concludes that SMS's sales force were "direct sellers" as that term is used in § 3508 for the tax years 1989 and 1990.

B. Section 530 of the Revenue Act of 1978—Professional Advice

■ 8. Section 530 of the Revenue Act of 1978 (the 1978 Act) was enacted by Congress to provide interim relief to certain taxpayers involved in employment tax status controversies with the IRS. *Donovan v. Tastee Freez (Puerto Rico), Inc.*, 520 F.Supp. 899, 903 (D.P.R.1981). Section 530 of the 1978 Act is codified as a footnote to 26 U.S.C. § 3401. Congress intended that § 530 would serve as a shelter for taxpayers who had acted in good faith from the potentially harsh retroactive tax liabilities resulting from IRS reclassification of independent contractors as employees. *See United States v. MacKenzie*, 777 F.2d 811, 815 (2d Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986) (citing *Ridgewell's Inc. v. United States*, 228 Ct.Cl. 393, 655 F.2d 1098, 1101 (1981)). As previously noted, § 530 was later extended indefinitely by the Tax Equity and Fiscal Responsibility Act of 1982.

9. Although the court has previously concluded that the members of SMS's sales staff are properly classified as direct sellers under § 3508, I further conclude that SMS has demonstrated that it is entitled to relief under § 530, even if the telemarketers and delivery persons do not qualify as direct sellers.

■ 10. The government has stipulated and the court finds that SMS has met the first two tests under § 530: that SMS has consistently treated its telemarketers and delivery persons, as well as all individuals holding similar positions, as independent contractors for federal tax purposes; and that SMS filed all required tax returns, including information returns, in a manner consistent with having treated the telemarketers and delivery persons as independent contractors. Thus, the only remaining question is whether SMS had a reasonable basis for treating its telemarketers and delivery persons as inde-

pendent contractors. The term "reasonable basis" is to be construed liberally in favor of the taxpayer. *See* H.R.Rep. No. 1748, 95th Cong., 2d Sess. 5, 1978–3 C.B. (Vol. 1) 629, 633. *See also Lambert's Nursery and Landscaping, Inc. v. United States*, 894 F.2d 154, 157 (5th Cir.1990); *General Inv. Corp. v. United States*, 823 F.2d 337, 340 (9th Cir. 1987).

11. Section 530 provides three non-exclusive methods by which taxpayers can demonstrate a reasonable basis for having treated individuals as independent contractors rather than employees. The first of these statutory safe harbors is reliance on judicial precedent or published rulings. The second of the statutory safe harbors is reliance on a past IRS audit of the taxpayer in which there was no assessment attributable to the treatment, for employment tax purposes, of individuals holding positions substantially similar to those held by the workers at issue. The third statutory safe harbor is reliance on the long-standing recognized practice of the worker's industry. *See* § 530(a)(2). However, the language of § 530(a)(2) refers to the three statutory safe harbors as merely "one method of satisfying the requirements [of the reasonable basis test]." Based upon that language, both the IRS in its procedural guidelines and the courts have held that "[a] taxpayer who fails to meet any of the three [statutory] 'safe havens' may nevertheless be entitled to relief if the taxpayer can demonstrate, in some other manner, a reasonable basis for not treating the individual as an employee." Rev.Proc. 85–18, 1985–1 C.B. 518. *See also In re Rasbury*, 130 B.R. 990 (Bankr.N.D.Ala.1991), *aff'd, United States v. Rasbury (In re Rasbury)*, 141 B.R. 752 (N.D.Ala.1992).

■ 12. SMS claims that its reliance on the advice of two professional tax advisors is sufficient to demonstrate a reasonable basis under § 530 for not treating its telemarketers and delivery persons as employees. I agree. Under the circumstances of this case, reliance upon the professional advice rendered by two CPAs—Mr. Gee and Mr. Sharpe—constitutes a reasonable basis for SMS having treated its telemarketers and delivery persons as independent contractors.

It is undisputed that Mr. Gee explored with SMS's president, Mr. Allen, the facts about SMS's business relevant to the requirements found in § 3508. Mr. Gee testified that he discussed with Mr. Allen that SMS's compensation structure would meet the "substantially all remuneration" requirement, that a written contract was required, and that one existed which met the requirements found in the statute. After determining that the telemarketers and delivery persons would only be compensated on a commission basis and that a written contract meeting the requirements of the statute existed, Mr. Gee advised Mr. Allen that he believed § 3508 applied and that the telemarketers and delivery persons could and should be treated as independent contractors. Thus, not only has Mr. Gee consistently filed all appropriate federal documents related to this status under § 3508, he has also represented SMS in various state unemployment tax investigations and has consistently taken the successful position with those agencies that the telemarketers and delivery persons qualified as "direct sellers" under § 3508.

13. The IRS attacks SMS's reliance upon Mr. Gee's advice based on the fact that Mr. Gee was unaware of the existence of § 3508 at the time Mr. Allen inquired of him. Because at that time the statute had just been enacted, and based on Mr. Gee's conduct in researching the matter, I am of the opinion that it was reasonable for Mr. Allen to rely upon the advice of his CPA. Only after he had examined the statute line-by-line in the context of the information provided by Mr. Allen did Mr. Gee opine that SMS had met the essential elements of § 3508.

14. I further conclude that SMS's reliance upon the advice of Mr. Sharpe, who examined the information provided by Mr. Allen in the context of the common law factors governing independent contractor status, was reasonable, thereby further entitling SMS to the protection of § 530. As did Mr. Gee, Mr. Sharpe testified as to his education and experience in similar tax matters and indicated that his advice was based upon the information provided by Mr. Allen. The IRS's reliance on *In re McAtee*, 115 B.R. 180

(N.D.Iowa 1990), is thus misplaced. In that case, the taxpayer's accountant did not testify, nor was his identity disclosed on the record. Moreover, there was no evidence in the record as to exactly what advice the accountant gave the taxpayer or what information the taxpayer gave to the accountant. *Id.* at 184–85. By contrast, the undisputed testimony in this case indicates that, so far as Mr. Allen knew, Mr. Gee and Mr. Sharpe were fully capable and qualified to render advice on the question asked of them. It is also undisputed that Mr. Allen fully disclosed all pertinent information necessary for his accountants to render that advice.

15. Although the term "reasonable basis" is not defined in the Code or regulations, an analogy may be drawn from those cases interpreting the term "reasonable cause" as it governs the determination of whether income tax penalties should be imposed upon a taxpayer.[3] In determining if reasonable cause exists, the courts and IRS regulations generally look to see whether the taxpayer "exercised ordinary business care or prudence." *See, e.g.,* 26 C.F.R. § 301.6651–1(c)(1). Generally, the courts have found that reasonable cause exists where the taxpayer relied on the advice of a trusted attorney or accountant. *See, e.g., Vorsheck v. Commissioner,* 933 F.2d 757 (9th Cir.), *cert. denied,* 502 U.S. 984, 112 S.Ct. 591, 116 L.Ed.2d 615 (1991). Indeed, in this regard, the Supreme Court has stated that:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. "Ordinary business care and prudence" do not demand such actions.

---

3. Unlike § 530's reasonable basis standard, the reasonable cause test is not liberally construed in

favor of the taxpayer.

*United States v. Boyle,* 469 U.S. 241, 251, 105 S.Ct. 687, 692, 83 L.Ed.2d 622 (1985) (emphasis added and citation omitted). Under the circumstances of this case, then, I conclude that SMS's reliance on the advice of two CPAs is a reasonable basis for treating its telemarketers and delivery persons as independent contractors, entitling it to the protection of § 530.

C. Section 530 of the Revenue Act of 1978—Prior Audit Safe Harbor.

16. The leading case involving the prior audit safe harbor provision under § 530(a)(2)(B) is *Lambert's Nursery and Landscaping, Inc. v. United States,* 894 F.2d 154 (5th Cir.1990). The Fifth Circuit set forth the requirements the taxpayer must satisfy to meet the prior audit safe haven defense. The taxpayer must establish (1) that the IRS conducted a prior audit of the taxpayer for a particular tax year; (2) that the IRS determined in the prior audit that the taxpayer's workers were independent contractors; (3) that the workers who were the subject of the prior audit are "substantially similar" to the workers at issue; and (4) that the taxpayer treated the two groups of workers in a "substantially similar" fashion. Unlike the taxpayer in *Lambert's Nursery,* SMS failed to establish the existence of a past IRS audit of SMS. It did establish, however, that Mr. Allen individually, as well as three corporations he owned in the early 1970's, were audited by the IRS. Mr. Allen nevertheless admitted that he did not know for certain what year the purported audits took place, or for what tax years the audits were conducted. He also admitted that he has no records reflecting that audits were conducted, or to what tax years the audits pertained. Although he testified generally that no adverse independent contractor determination was made by the IRS, he was not able to testify about the precise results of the audits.

17. Accordingly, while there was evidence that Mr. Allen treated SMS's sales force in the same manner as he had treated his sales force in his prior businesses, the evidence is insufficient for the court to conclude that SMS was entitled to rely on the results of the prior audit.

*Conclusion*

Therefore, because SMS's telemarketers and delivery persons are direct sellers under 26 U.S.C. § 3508 or, alternatively, because SMS is entitled to the protection of § 530 on account of its reasonable reliance on professional advice, SMS shall be awarded judgment in its favor and against the United States in the amount of $400, which represents the total amount of employment taxes paid for the tax years at issue.

Order accordingly.